J-A23030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.M. AND T.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M. | No. 1994 WDA 2013 |

Appeal from the Order entered November 15, 2013,
in the Court of Common Pleas of Washington County,
Orphans' Court, at No(s): 63-13-0934, 63-13-0935

BEFORE: DONOHUE, ALLEN, and MUSMANNO, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED SEPTEMBER 26, 2014**

L.M. ("Father") appeals from the order involuntarily terminating his parental rights to his daughters, A.M., born in June of 2005, and T.M., born in February of 2002.[1] Upon careful review, we affirm.

The record reveals that Father and the children relocated to Washington County, Pennsylvania, from Brooke County, West Virginia, at an unspecified time following the April 2009 involuntary termination of the parental rights of the children's mother by order of the Circuit Court of Brooke County.[2] Trial Court Order, 11/15/13, at ¶¶ 3-4. The Washington County orphans' court found, "[a]mong other issues, the birth mother was found to have [sexually abused] T.M. while in her care and [in] Father's care." Trial Court Opinion, 2/24/14, at 3. Further, the orphans' court found

---

[1] We note that the briefing schedule for this case was delayed due to the common pleas court sending the complete certified record to this Court nearly three months after the record was due.

[2] The children's mother is not a party to this appeal.

that "the Circuit Court did not terminate Father's parental rights, but found that an issue remained as to whether the children could be returned to Father at that time and continued supervised visits with Father and the children."[3] *Id.* at 3 (footnote omitted). The Circuit Court eventually returned the children to Father's care and custody, and the family subsequently relocated to Washington County.

On April 11, 2011, the Washington County Children & Youth Social Service Agency ("CYS") became involved with the family when T.M., then age nine, reported to her school teacher that Father had beaten her with a board. Trial Court Order, 11/15/13, at ¶¶ 2, 5. As a result, Father was charged with the crime of recklessly endangering another person, to which he pleaded guilty. *Id.* at ¶ 7. Father was sentenced to a term of probation for twelve months. *Id.* As a condition of his sentence, Father participated in parenting counseling and anger management. *Id.* CYS initially removed the children from the home, but did not file a dependency petition. CYS returned the children to Father and provided in-home services. N.T., 11/15/13, at 47. CYS closed its case in December of 2011. *Id.*

On September 19, 2012, T.M. reported to her school teacher that Father had beaten her with a "coal miner's belt." Trial Court Order, 11/15/13, at ¶ 9. By order dated September 20, 2012, the children were

---

[3] The order of the Circuit Court of Brooke County involuntarily terminating the parental rights of the children's mother was admitted as an exhibit during the subject proceedings. *See* N.T., 11/15/13, at 46. However, the exhibit is not included in the certified record before this Court.

placed in the custody of CYS. *Id.* at ¶ 10. The children were adjudicated dependent on November 20, 2012. N.T., 11/15/13, at 22.

In addition, on September 20, 2012, the Washington County Adult Probation Office detained and incarcerated Father for violating his probation as a result of T.M.'s allegations. *Id.* at ¶ 11. On November 7, 2012, Father was found to be in violation of his probation, and was re-sentenced to an intermediate punishment program for a term of 23 months, the first two months of which he was incarcerated, followed by six months of intensive supervision. *Id.* As a condition of his sentence, Father again participated in parenting counseling and anger management. *Id.*

On July 29, 2013, CYS filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (b). A termination hearing was held on November 15, 2013, during which CYS presented testimony from the following witnesses: Azure Hixenbaugh, CYS caseworker; Frank C. Kocevar, the children's Guardian *Ad Litem* ("GAL") in the dependency proceedings; and Megan Van Fossan, the supervisor of special services in the McGuffey School District. Father was present for the hearing, but he did not testify. Father presented the testimony of Elana Carroll, a caseworker for Try Again Home Visitation, and David Cincinnati, a CYS adoption caseworker.

By order dated and entered on November 15, 2013, the orphans' court involuntarily terminated Father's parental rights to the children pursuant to

J-A23030-14

23 Pa.C.S.A. § 2511(a)(2), (5), and (b). Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[4]

On appeal, Father presents three issues for our review:

I. Did the Court err as a matter of law and/or abuse its discretion in finding that clear and convincing evidence was provided to support termination of father's parental rights under 23 Pa.C.S.A. § 2511(a)(2), when a significant amount of evidence was provided that [Father] had successfully completed all serv[ice]s ordered of him and has been able to implement skills learned?

II. Did the Court err as a matter of law and/or abuse its discretion in finding that clear and convincing evidence was provided to support termination of father's parental rights under 23 Pa.C.S.A. § 2511(a)(5), when a significant amount of evidence was provided that [Father] had successfully completed all serv[ice]s ordered of him and has been able to implement skills learned?

III. Did the Court err as a matter of law and/or abuse its discretion in determining the termination of Father's parental rights would serve the needs/welfare of the children and not be harmful to the children as required under 23 Pa.C.S.A. § 2511(b), when the evidence clearly showed a strong and beneficial parent-child bond that would [ ] be detrimental to the children if broken?

Father's Brief at 5.

We review this appeal according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

---

[4] Father subsequently filed an amended notice of appeal and a concise statement of errors complained of on appeal to reflect the proper orphans' court docket number.

- 4 -

findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

- 5 -

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (*citing* 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we conclude that the orphans' court properly terminated Father's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:[5]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

[5] It is well-settled that this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we do not consider Father's second issue related to Section 2511(a)(5).

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

With respect to section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Father argues the evidence was insufficient to support termination under Section 2511(a)(2). Specifically, Father argues he "has been compliant and has successfully completed all court ordered services." Father's Brief at 17. In addition, Father argues, "the skills [he] learned from the parenting and anger management courses were displayed during the two (2) hour visitation periods." *Id.*

In contrast, the orphans' court concluded, "despite repeated courses in nurturing parenting skills, Father was unable to implement such skills. Father has demonstrated his propensity for physical and verbal abuse. . . ." Trial Court Opinion, 2/24/14, at 5. Upon careful review, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights.

The evidence reveals that Father was court-ordered to participate in parenting and anger management classes, as well as a mental health

assessment. N.T., 11/15/13, at 22. Ms. Hixenbaugh, the CYS caseworker for this family until May of 2013, testified on cross-examination by Father's counsel that Father has been "compliant with every aspect of services requested of him. . . ." *Id.* at 30-31; *see also id.* at 32. She testified that Father was successfully discharged from parenting classes. *Id.* at 33. Similarly, Mr. Cincinnati, the family's current CYS adoption caseworker, testified that Father "has completed the services that were put in place for him." *Id.* at 118. With respect to whether Father successfully completed parenting classes through the Justice Works program, Mr. Cincinnati testified that, "Justice Works does not do it successfully, they do say he has completed their program. They do not put a successful or not successful so whether or not he completed or did not complete it." *Id.* In sum, Mr. Cincinnati testified that Father had completed the program through Justice Works. *Id.*

With respect to supervised visits, Father was permitted one visit per week for two hours. *Id.* at 23. In addition, he was permitted one ten minute telephone call per week with each child. *Id.* Ms. Hixenbaugh testified that Father attended all visits with the children, and that he has behaved appropriately during the visits. *Id.* at 31. Likewise, Ms. Carroll, the caseworker at Try Again Home Visitation, who supervised Father's visits with the children, testified, in part, that during visits Father has "always been very appropriate with the children." *Id.* at 103. Further, Mr. Kocevar,

the GAL in the dependency proceedings, testified that Father was consistent with his telephone calls to the children. *Id.* at 56.

Nevertheless, Ms. Hixenbaugh, Mr. Cincinnati, and Mr. Kocevar unanimously recommended that Father's parental rights be terminated. *Id.* at 24-26, 58-59, 124-125, 127. Despite Father pleading guilty to the charge arising from T.M.'s allegation that he beat her with a board, Ms. Hixenbaugh testified as follows on direct examination:

> Q. Did you ever have any direct discussions with [Father] concerning this case in terms of what actions he took against either or both children?
>
> A. [Father] has denied both times that he has ever touched [T.M.].

*Id.* at 24. Further, Ms. Hixenbaugh testified:

> Q. Why do you believe that [Father is] unable to effectively parent these children?
>
> A. He's had several parenting classes. His ability to retain and implement what he has learned is not necessarily there. He's had anger management classes. What he has learned, he is just not able to implement and at one point we gave [Father] the benefit of the doubt because he was participating in services and we returned the children to his care. . . . The children were home for I'd say six to seven months and then the incident with the coal mining belt occurred and again, [T.M.] has unexplained injuries and no one can explain how she got them and [Father is] the primary caregiver.

*Id.* at 25. Ms. Hixenbaugh subsequently testified on cross-examination by Father's counsel as follows:

> Q. [ ] Why exactly was [Father] targeted for [involuntary termination of his parental rights]?

A. I would not necessarily use the word targeted. [Father's] case was identified as going toward termination due to the history of his case, [T.M.] having two different incidents of having severe bruising and him throwing his hands in the air saying he didn't do it, he doesn't know how it happened[,] and there is no reasonable explanation. . . .

*Id.* at 34. Thus, Ms. Hixenbaugh's testimony demonstrates that despite Father's compliance with court-ordered services, he has refused to acknowledge and take responsibility for his inappropriate actions toward T.M.[6]

In addition to the above evidence, the orphans' court based its termination decision on Father's "incapacity to take care of the children's medical and education needs. . . ." Trial Court Opinion, 2/24/14, at 5. Ms. Van Fossan, the supervisor of special services in the McGuffey School District, which the children attended, testified that T.M. has an I.Q. of 81.[7] N.T., 11/15/13, at 73. Ms. Van Fossan also testified that T.M. has significant behavioral issues. *Id.* at 69. Ms. Van Fossan testified on direct examination, with respect to addressing T.M.'s behavioral issues with Father prior to the incident involving Father hitting T.M. with a board, as follows:

Q. Were any of these behavioral issues addressed by you or other members of [the school district] with her father?

---

[6] Further, Ms. Hixenbaugh testified that she observed Father "yell at [T.M.]." N.T., 11/15/14, at 92. She testified that incidents occurred involving Father "screaming, yelling, cussing, carrying on" with T.M. as a result of her behavioral issues. *Id.* at 90-91.

[7] A.M., Father's younger daughter, is not in special education, nor is there evidence that she has special needs. N.T., 11/15/14, at 84.

A. Numerous times.

Q. Were any solutions ever reached with regard to dad and her actions?

A. We finally came to a crisis point. . . . Dad never got her Medicaid card so she ran out of medication so she was unmedicated for a very extended period of time because to switch from West Virginia Medicaid to Pennsylvania Medicaid takes some time. . . .[8] The psychiatrist had given her – [ ] three different medications to help her control the impulsive behaviors. [T.M.] was referred to East App which is the elementary student assistance program because of the increased defiance and behaviors. Met with dad on three different occasions and dad refused to sign the permission to evaluate. . . . Dad finally did sign the permission to evaluate for Special Ed services. . . .

*Id.* at 69-70.

Further, Ms. Van Fossan testified, "we talked [with Father] about strategies in terms of holding [T.M.] accountable for her behaviors and appropriate consequences for a child that age[.] [W]e met with him actually numerous times even after that to talk about what he could do in the home. . . ." *Id.* at 71. Ms. Van Fossan expressed concern that Father did not understand the issues relating to controlling T.M.'s behaviors. Upon inquiry by the orphans' court, Ms. Van Fossan testified:

Q. [Y]ou . . . made the comment . . . that you questioned whether dad was understanding?

A. Yes.

Q. Can you elaborate on that? Understanding what you were telling him?

_____

[8] Ms. Van Fossan explained that "CYS had become involved with the case and got [the children] medical access card." *Id.* at 80.

- 12 -

A. What I told him, what the school psychologist told him, what the school social worker told him, what the classroom teacher told him. I don't know how much he understood. Like if you had a conversation back and forth like this is what's going on at school, what have you found helpful, there wasn't a dialogue going on there. Our school psychologist really was concerned.

*Id.* at 94.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to Section 2511(a)(2). Indeed, the testimony of Ms. Hixenbaugh and Ms. Van Fossan demonstrates that Father's repeated and continued incapacity, abuse, neglect or refusal has caused the children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Further, the causes of Father's incapacity, abuse, neglect or refusal cannot or will not be remedied. Therefore, Father's first issue fails.

Father additionally asserts the evidence was insufficient to support termination of his parental rights pursuant to Section 2511(b). Father relies on the testimony of Ms. Carroll, who supervised his visits with the children, in arguing that the children have a bond with him that would be detrimental to them if severed.

With respect to the bond analysis pursuant to section 2511(b), our Supreme Court has confirmed, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination

- 13 -

petition." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). The ***T.S.M.*** Court quoted with approval, as follows:

> [A]s Judge Tamilia eloquently observed while speaking for the [Superior] court, it is "an immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." ***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, Judge Tamilia cautioned against denying termination of parental rights based solely on the fact that a child has an attachment to the parent: "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." ***Id.*** at 535 (quoting ***In re Involuntary Termination of C.W.S.M.***, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J., dissenting).

***In re T.S.M.***, 71 A.3d at 267 (footnote omitted). In addition, the ***T.S.M.*** Court stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 268 (citation omitted).

In this case, Ms. Carroll testified that the children's foster parents usually bring them to their visits with Father. N.T., 11/151/4, at 105. Ms. Carroll testified with respect to the children's reaction at seeing Father, as follows:

> Q. What's their demeanor? What do you see happening when [the children] get out of that car and they see [Father]?
>
> A. I see [Father] walking down the steps usually and the girls come running to him and throw their arms around him and hug him.
>
> Q. So they understand who he is?

- 14 -

A. Yes.

Q. They appear to enjoy being around him?

A. Yes.

Q. Do they appear afraid of him?

A. Not that I've noticed.

Q. As a matter of fact, you said they come running up to him?

A. Yes, they do come running up to him all the time and they instantly start talking about their day to him.

*Id.* at 105. Upon inquiry with respect to whether the children seem sad to leave the visits, Ms. Carroll testified, "[s]ometimes [A.M.] will say things like I'm not ready to leave, I don't want to go." *Id.* at 106-107. She did not testify with respect to T.M. ever indicating the same at the conclusion of visits.

Ms. Hixenbaugh testified that the children are in pre-adoptive and separate foster homes. N.T., 11/15/13, at 14. She testified that the children see each other daily.[9] *Id.* at 48. Ms. Hixenbaugh testified that they have "adapted well" in their foster homes. Id. at 15. Likewise, Mr. Cincinnati, the CYS adoption caseworker, testified that the children are doing well in their foster homes. *Id.* at 126.

---

[9] T.M.'s foster mother is the mother-in-law of A.M.'s foster mother. N.T., 11/15/14, at 48. Ms. Hixenbaugh testified that the children ride to and from school together on the same school bus, and they participate in family functions together with their foster families. *Id.* at 50.

- 15 -

Upon careful review, we discern no abuse of discretion by the orphans' court in concluding that terminating Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the children where Father refuses to acknowledge his inappropriate physical acts toward T.M., and the children are doing well with their foster families. Further, we observe that the GAL in the orphans' court proceeding has joined CYS's brief on appeal in support of terminating Father's parental rights. Accordingly, we affirm the order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/26/2014